# JANUARY, 1921

H. WESTERMAN ET AL. v. C. D. MIMS, SECRETARY OF STATE.

No. 3386. Decided January 5, 1921.

(227 S. W., 178.)

1.—Primary Election—Independent Candidate.—Official Ballot—Mandamus—Parties.

A group of qualified voters in a judicial district who have conformed to the requirements and are within the conditions of articles 3164, 3165 and 3166 of the Revised Statutes have such interest and legal right as qualifies them to maintain action for mandamus to require the Secretary of State to have the name of a qualified person so chosen by them and accepting their nomination placed on the official ballot as an independent candidate for district judge in opposition to the candidate chosen at a Democratic primary election. They are proper parties plaintiff to such action where their candidate himself could have maintained it, though he does not join with them in the suit, but is by them made a co-respondent to their petition. (P. 35).

2.—Official Ballot—Refusal of Nomination.

The nomination by a political party of a candidate for office may be declined and annulled by him twenty days before the election (Rev. Stats., art. 3172). Though such nomination, if not declined, would prevent his name from being placed on the official ballot as an independent candidate also (Rev. Stats., art. 2970) he has the full time allowed by law to decline the party nomination, and after he has done so it presents no obstacle to the placing his name on the ballot as an independent candidate. (Pp. 35, 36.)

3.—Primary Election—Pledge to Support Nominee—Legal or Moral Obligation.

The pledge taken by the voter at a primary election to support the nominees of the primary constitutes a moral, not a legal obligation, it being one of which it is not practicable to compel performance by legal sanction and which lacks any reasonably certain measure of the cooperation which it requires. (Pp. 36-38).

4.—Same—Constitution—Construction.

A statute which requires of the participant in a primary, by law, the invariable subsequent casting of a certain ballot in the election, might be of doubtful constitutionality, and such construction is to be avoided where another is permissible. (P. 38).

5.—Mandamus—Discretion.

The granting of mandamus is discretionary and it is not a writ of right, and the relator seeking the remedy must come into court with clean hands. Relators could not maintain suit to place on the ballot as independent candidate one who was precluded by this rule from maintaining such suit in his own behalf, and where the proposed candidate has voted in the primary, taking the pledge to support the nominee thereat, his name will not be ordered placed on the ticket as an independent candidate in opposition to such nominee. (Pp. 39, 40).

6.—Dissenting Opinion.

Mr. Chief Justice PHILLIPS, concurring in the refusal of mandamus, but dissenting as to the grounds announced in the opinion of the majority thereon, holds:

(a). The right to the writ should be determined by the question whether the candidacy of the independent nominee was legal or illegal, not by the court's view as to its morality. Its moral phase should be left to the voters.

(b). Relators seeking the mandamus, not having participated in the primary, were not guilty of breach of any obligation resting on them, and could be denied relief only in case the law made the candidacy of their choice illegal

(c). The obligation of one participating in the primary and taking the required pledge, not to become a candidate in opposition to the primary nominee, was a legal one by the statute, and rendered him legally ineligible as a candidate.

(d). Statutes create legal, not moral rights and duties. The precepts of the moral law, except as municipal law has embodied them and diffused them through its own doctrines and statutes, are left for their enforcement to the individual conscience. Once imposed by a valid statute they become legal duties.

(e). There is no question as to the constitutionality of a statute requiring of participants in primaries a pledge to support the candidate chosen; Nor is there any reason for construing its plain requirements as imposing moral rather than legal obligations because of doubt in the latter case of their constitutionality.

(f). A statute imposing a given duty does not the less make that a legal duty because it fails to provide a penalty for its breach. The law will afford an appropriate remedy. (Pp. 40-48).

Original application by Westerman and others to the Supreme Court for writ of mandamus against Mims as Secretary of State.

On motion for leave to file the petition MR. CHIEF JUSTICE PHILLIPS dissented from the ruling *per curiam* granting such motion, fil-

ing a written opinion thereon. On final hearing the writ of mandamus was refused in an opinion by MR. JUSTICE GREENWOOD. The Chief Justice, while concurring in the result, filed, at a later date, his opinion dissenting from the grounds announced for such ruling, for reasons indicated in his dissenting opinion on the motion for leave to file. All three opinions are here printed.

*Frank S. Anderson,* for relators.—The respondent C. D. Mims, as Secretary of State of state of Texas, having conceded that the application addressed to him by the relators conformed to the requirements of Articles 3164, 3165 and 3166 of the Revised Statutes, and that Aubrey Fuller, the citizen in whose favor the application was made, filed his consent with the Secretary of State to become a candidate for said office within 30 days after said primary election day, it became the duty of the Secretary of State to issue his instructions as required by Article 3167, *supra*. Having admitted the existence of the facts required to be shown by Articles 3164, 3165 and 3166 of the Revised Statutes, and that the respondent, Audrey Fuller, was qualified under the Constitution and laws, the Secretary of State had no discretion in the matter and he can be compelled by writ of mandamus to issue his instructions as above provided. Sansom v. Mercer, 68 Texas, 488, 5 S. W., 62; Boynton v. Brown, 164 S. W., 893-895; Dubose v. Woods, 162 S. W., 3-5; McLaughlin v. Smith, 140 S. W., 249, 148 S. W., 288.

The relators have sufficient interest in the controversy to maintain this suit. See cases cited *supra*.

The right of the relators to address their petition to the Secretary of State, and upon the consent of the respondent Aubrey Fuller being filed with the Secretary of State within the time provided by Article 3167, to have the name of said Aubrey Fuller certified to the county clerk and printed on the official ballot is a right given them by statute, and therefore a legal right. Gilmore v. Waples, 108 Texas, 167, 188 S. W., 1037-1044; Articles 3082, 3083 and 3083a, of the Revised Statutes. As we construe those articles, if the Secretary of State refuses to issue his instructions as required by law, any voter may maintain a suit for mandamus to compel the issuance thereof.

If any interested party or any voter may maintain a suit for injunction to enforce the provisions of Arts. 3082 and 3083 we believe the proper construction of the three articles of the statute above quoted is, that any person interested, or any voter, may maintain a suit for mandamus to compel the proper officer to do his duty.

Such suit might be maintained at common law, even where not authorized by statute. Gilmore v. Waples, *supra,* citing Brown v. Cole, 54 Misc. Rep., 278, 104 N. Y. Supp., 109.

As to the question of the alleged ineligibility of the respondent Aubrey Fuller to become an independent candidate because he voted

in the Democratic primary we call the attention of the court to its decision in the case of Koy v. Schneider, 110 Texas, 369, 218 S. W., 479, 221 S. W., 880, 916.

The question raised by the answer of the respondent C. D. Mims, that the respondent was nominated for the office of Judge of the 56th Judicial District of Texas by the American Party, that he was present at the convention of said party which so nominated him, and that he did not decline such nomination until the 2nd of October, 1920, was disposed of by a unanimous decision of this court upon the application of George N. Defferari for leave to file petition for writ of mandamus, which application was granted and the application for writ of mandamus filed on the 13th day of October last, since which time the Secretary of State without further question issued his instructions to the county clerk of Galveston county to place the name of George N. Defferari on the official ballot.

We do not deem a discussion of the questions last mentioned material, because the respondent had until 20 days prior to election to file his declination of the American Party nomination, and the pleadings show that such declination was filed on the 2nd of October, 1920 with the county clerk of Galveston county, and with the respondent Secretary of State on the 4th day of October, 1920, and further, we believe the filing of his written consent to accept the independent or non-partisan nomination for said office filed with the Secretary of State on the 21st day of August, 1920, operated as a declination of the American Party nomination.

However, we assert that the Secretary of State had no authority to consider such questions but that his duty is defined by Art. 3167 of the Revised Statutes and that he should be required to perform it.

*Robert G. Street, George B. Ketchum,* and *C. D. Mims,* Secretary of State, respondents in pro. per.—Aubrey Fuller is the only person who has any pretended right or who will be, or is affected by respondents' action or non-action, and his name does not appear as a party relator. 199 S. W., 889; 27 S. W., 739; 57 Mich., 1089; Art. 3167, R. S., 1911; 39 Minn., 476; 49 Ill., 233; 29 Cal., 210; 137 N. Y., 218; Merrill on Mandamus, par. 228; High, Extra. Leg. Remedies, par. 434.

A person who has participated in a Democratic primary, and to that extent affiliated with the Democratic party, is ineligible to become an opposing candidate of the nominee of the Democratic party. Art. 3096, R. S., 1911; 108 S. W., 169; 188 S. W., 1040; 189 S. W., 122; 108 Texas, 169; 129 Cal., 337; 109 N. E., 590; 221 Ill., 9; 59 L. R. A., 448; 104 N. Y. Supp., 109; 97 Pac. 396; 138 N. W., 1; 85 Org., 246; 103 Pac., 188; 24 Atl., 489; Opinion of Attorney General, No. 2251, dated Sept. 20, 1920, addressed to Hon. C. D. Mims, Secretary of State.

A person having accepted nomination of an organized political party as candidate for office, is ineligible to have his name certified and printed as a non-partisan and independent candidate for the same office on the official ballot. Articles 2966-65-64-67-69-70, R. S., 1911; 142 Pac., 520; 92 N. W., 5; 59 L. R. A., 448; 42 L. R. A., 239; 160 Pac., 245; 169 N. W., 266; 85 Oregon, 246; 29 L. R. A., 330; 121 Md. 656; 121 S. W., 979.

Aubrey Fuller, if he became eligible at all at any time to have his name printed on the official ballot by the State of Texas, became so on October 2, 1920. The statute regulating the time in which petitions and applications for the name of non-partisan and independent candidates to be printed on the official ballot is mandatory and must be complied with. 54 N. Y. Supp., 690.

Relators petition being defective in the time in which it could be filed, cannot be considered a valid petition now if the defect is removed at a time later than statutory time allowed for filing such petition. The doctrine of *"nunc pro tunc"* does not apply. 54 N. Y. Supp., 690.

The court, *per curiam,* granting relators leave to file their petition for mandamus, MR. CHIEF JUSTICE PHILLIPS delivered the following dissenting opinion.

The purpose of this proceeding is the issuance of a mandamus by this Court requiring the Secretary of State to direct the printing of the name of Aubrey Fuller upon the official ballot for the general election in November in Galveston County, as an independent candidate for District Judge of the Fifty-sixth District. Mr. Fuller, it is revealed by the petition, voted in the Democratic primary held in the county in July, in which Hon. Robert G. Street was the successful candidate for the nomination for the same office, and subscribed to the statutory pledge to support the nominees of the primary.

The right to the mandamus is based upon the holding of the majority of this Court in the Woman Suffrage Case (Koy v. Schneider, 110 Texas, 369, 218 S. W., 479), that notwithstanding the statute requiring a voter in a party primary to agree that he will support the nominees of the primary, he is under no legal obligation to do so, and may vote as he chooses in the general election. I entered my emphatic dissent from that decision, and as emphatically dissent from its application here.

The chief design of our laws governing primary elections is to protect the integrity of a party nomination. If the primary binds nobody, if one who participates in it and subjects himself to the statutory pledge and its corresponding statutory obligation, is at liberty to repudiate its whole purpose and result, and not only may vote as he pleases in the general election, but as an independent candidate in

111 Tex.—3

such election may legally oppose one of its nominees, the primary is a farce and our statutes governing the subject are but empty pronouncements. Such is not my view of the law.

The relators, in my opinion, show no right to a mandamus and this motion should be refused.

Delivered October 13, 1920.

MR. JUSTICE GREENWOOD delivered the opinion of the court.

The relators seek by mandamus to compel the respondent, Secretary of State, to instruct the County Clerk of Galveston County to have the name of respondent, Aubrey Fuller, printed in the independent column, under the title of Judge of the 56th Judicial District, on the official ballot in that county, at the general election on November 2nd, 1920.

It was averred and admitted that the respondent Fuller participated and voted in the democratic primary in Galveston County, on July 24, 1920, at which the respondent Robert G. Street was a candidate and was nominated for Judge of the 56th Judicial District; that the official primary ballot had printed on it the words: "I am a democrat and pledge myself to support the nominees of the primary;" that the American Party of Galveston County nominated respondent Fuller, on July 31st, 1920, as a candidate for Judge of the 56th Judicial District; that on October 2, 1920, he filed with the County Clerk of Galveston County a declination of the nomination; that on August 21st, 1920, the relators presented and delivered to the respondent Secretary of State their written application, requesting that the name of respondent Fuller be printed on the official ballot at the general election in Galveston County, as an independent candidate for Judge of the 56th Judicial District; that relators were all qualified voters, constituting more than three per cent. of the votes cast in the county in the general election of 1918; that none of the relators signing the application participated in a primary which nominated a candidate for said office, and that the application was verified by the statutory affidavits of each relator; that on July 24th, 1920, respondent Fuller filed with the Secretary of State his written consent to become an independent candidate for Judge of the 56th Judicial District; that respondent Fuller was a citizen and a qualified voter of the County of Galveston and State of Texas, was more than twenty-five years of age, was a citizen of the United States; and, that he had been a practicing attorney in the State of Texas and in Galveston County for more than four years, had resided in Galveston County for more than two years next preceding November 2, 1920, and now resides in said county, of which he has been an actual, bona-fide citizen for more than six months.

The contention of the relators is that since the application of relators and the consent of respondent Fuller conformed to the requirements of

articles 3164, 3165 and 3166 of the Revised Statutes, it became the duty, enforceable by mandamus, of the Secretary of State, under article 3167, to issue his instructions to the county clerk, directing that the name of respondent Fuller be printed in the independent column of the official ballot.

On the other hand, the respondents, save Fuller, contend: first, that relators show no such interest as authorizes them to maintain this proceeding; second, that respondent Fuller's nomination, on July 31, 1920, by the American Party for the office of Judge of the 56th Judicial District, rendered him ineligible to become an independent candidate, at the time relators' application was presented and for more than thirty days after July 24, 1920, the date of the primary election, and that the subsequent declination of the nomination by Fuller was ineffectual to render him eligible to become an independent candidate; and, third, that relators were not entitled to maintain this suit by reason of respondent Fuller's participation in the democratic primary at which respondent Street was nominated.

It is clear to us that if this suit could be maintained by respondent Fuller it can likewise be maintained by relators. The objection that respondent Fuller is alone affected by the action of the Secretary of State is not tenable. The right asserted by relators is to present an independent candidate, designated by themselves, for the consideration of each voter through the official printed ballot. Such a right is conferred by statute on certain groups of qualified voters, under certain conditions. The precise question to be determined is whether the conditions exist which entitle relators, as such a group, to enforce by mandamus the right stated. The statement of the question is sufficient to disclose the interest of relators and their privilege to have the question adjudicated, notwithstanding respondent Fuller may not also join as relator in seeking the adjudication.

Article 2970 of the Revised Statutes forbids the name of any candidate appearing more than once upon the official ballot, except as a candidate for two or more offices permitted by the Constitution to be held by the same person. Article 3172 authorizes a nominee for other than city offices to "decline and annul" his nomination by delivering to the officer with whom the certificate of his nomination is filed, twenty days before the election, a written declaration of his declination, signed before some officer authorized to take acknowledgments. While article 2970 warranted the Secretary of State to refuse to issue instructions for the printing of respondent Fuller's name on the official ballot as an independent candidate, during the time he was the nominee of the American Party, yet that nomination was *annulled* when respondent Fuller declined the nomination in the mode prescribed by article 3172. After the nomination was thus annulled, it furnished no further warrant for the refusal to instruct the placing of respondent Fuller's name on the ballot as an independ-

ent candidate, in compliance with an application filed in season. By this holding we simply recognize that the nominee has the time allowed by the terms of article 3172 for the exercise of his option to annul his nomination.

It is not the law that the writ of mandamus must be granted in every case upon a showing by relators that articles 3164, 3165 and 3166 of the Revised Statutes have been complied with. If the court were under any such compulsion, then the writ would have to be awarded though the candidate named were confessedly ineligible to hold the designated office. It is elementary that a mandamus will not be issued to compel the doing of that which the law forbids, and chapter 13, of the General Laws of the 36th Legislature, p. 17, expressly forbids the placing of the name of an ineligible person on the ballot at a primary or general election. Manifestly, one who seeks relief through this extraordinary proceeding must show himself entitled thereto under all applicable law, no matter where embodied.

If one is under obligation, legal or moral, to support a nominee of a party primary, the act of becoming a candidate against the nominee necessarily involves the breach of that obligation. Those who invite the breach cannot escape responsibility for the wrong it may involve. We are therefore of the opinion that if respondent Fuller could not maintain this action, under the averments of relators' petition, neither can the relators.

The relators and the contesting respondents differ as to the nature of the obligation imposed on a participant in a party primary. The latter contend that the obligation to support a nominee is a legal obligation, rendering the participant ineligible to become an opposing candidate. The former deny that any obligation is imposed on the participant save such as binds his honor and his conscience, and assert that no cognizance should be taken by the court of an obligation of that kind in awarding or withholding the writ of mandamus.

In support of the view last stated, the declarations in Koy v. Schneider, 110 Texas, 369, 218 S. W., 483 221 S. W., 916, are cited, to the effect that the voter was not bound legally but was bound morally to support the nominees of the primary wherein he voted. While those declarations were not necessary to the decision in that case and are not regarded as conclusive on the question here presented, a majority of the court, on careful consideration, are of the opinion that it cannot be properly said that the voter does become bound otherwise than morally to support primary nominees.

Article 3096 prescribes ''a primary test'' to be printed on each ballot as follows: ''I am a * * * * * * * (inserting the name of the political party or organization of which the voter is a member) and pledge myself to support the nominees of this primary.''

For many years such a test was required in party primaries while under no statutory regulation. The object of the test, when so required by party managers, was simply to determine the voter's qualifications to have a part in choosing the candidates of the party or in dictating its policies.

It is not believed that the Legislature can in reason be said to have had a different object in the enactment of article 3096. The purpose of the Legislature was the same as the pre-existing purpose of the party managers, and that was to exclude from party action all persons save those holding a present party allegiance and having a bona-fide present intention to support the party nominees.

If the entire purpose be not accomplished in determining whether the voter is a member of the party, having a subsisting intent to support the nominees, still we cannot say that the pledge imposes an executory legal obligation. The specific, statutory pledge is to "support" the primary nominees. As stated by Webster to "support" is "to uphold by aid or countenance." The Legislature must have given such an interpretation to the pledge, if they considered it binding on future conduct, in exacting it of women voters. when extending suffrage to them in primaries and conventions only.

The vital distinction between a legal obligation and a moral obligation is that it is practicable to enforce the former and impracticable to enforce the latter. To give effect to the distinction is to deny that the pledge imposes a legal obligation on the voter. It is utterly impracticable to enfore an obligation to uphold another by aid or countenance through either a decree for specific performance or an award of damages.

Of the decisions relied on by the contesting respondents to sustain the view that the pledge imposes a legal obligation on the voter, the case of State ex Rel. Labauve v. Michel, Secretary of State, 121 La., 374, 46 So. 434, seems nearest in point. In disposing of the objection that the statute requiring the voter to declare his affiliation with the party holding the primary violated the article of the Constitution of Louisiana which secured the voter the right to prepare his ballot in secrecy, the court said: "The answer to this is that the voter, by participating in the primary, impliedly promises and binds himself in honor to support the nominee, and a statute which exacts from him an express promise to that effect adds nothing to his moral obligation, and does not undertake to add anything to his legal obligation. The man who cannot be held by a promise which he knows he has impliedly given will not be held by an express promise."

We do not regard this opinion as contrary to our conclusion. The court affirmed that the primary voter, with or without the statute, incurred a moral obligation, binding on his honor. The court concluded that the obligation was no greater with, than without, the statute. In our opinion, the court did not declare or mean to de-

clare that there is any legal obligation, with or without the statute. On the contrary, the court found that there had been no attempt by the Legislature, in enacting the statute, to impose on the voter anything in the way of a legal obligation.

In our opinion, a voter cannot take part in a primary or convention of a party, to name party nominees, without assuming an obligation binding on the voter's honor and conscience. Such obligation inheres in the very nature of his act, entirely regardless of any express pledge, and entirely regardless of the requirements of any statute. The obligation, like the promise exacted by the statute, when treated as governing future conduct, is for co-operation in good faith to secure the success of the nominee. There is no reasonably certain measure of bona-fide co-operation in matters of this sort. The voter's conduct must be determined largely by his own peculiar sense of propriety and of right. It is for such reasons that the courts do not undertake to compel performance of the obligation. Being unenforceable through the courts, the obligation is a moral obligation. Herriott v. Potter, 115 Iowa, 648, 89 N. W., 91, 92. As stated by the Supreme Court of Pennsylvania: "A moral obligation in law is defined as one which cannot be enforced by action but which is binding on the party who incurs it in conscience and according to natural justice." Bailey v. Phila., 167 Pa. St., 569, 573, 46 Am. St. Rep., 693.

Moreover, we think the legislative intent ought to be plain before ballots are held forbidden, which reflect conscientious changes in party fealty. Grave doubt might arise as to interference with the privilege of free suffrage, guaranteed by our Constitution, should the statute be construed as invariably requiring the casting of certain ballots. In rejecting that construction, we avoid any serious question of the validity of the statute, and follow the rule "that where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such question are avoided, our duty is to adopt the latter." United States v. Del. & H. Co., 213 U. S., 408, 53 L. Ed., 849, 29 Sup. Ct., 536.

We do not say that circumstances might not arise under which one who had participated in a primary would be relieved of the moral obligation which is ordinarily incurred not to undertake the nominee's defeat. The present case does not call for the determination of the effect of extraordinary circumstances.

Relators admit that the candidate proposed by them did vote in the primary, and they apply for a mandamus to get his name on the ballot, in order to defeat the nominee, without disclosing any fact tending to excuse the breach of good faith and conscience, which they invite. Are they entitled to the writ on these admissions.

It is generally held by the courts of last resort in America that the writ of mandamus is a discretionary writ, and it is frequently stated that it is not a writ of right. Smith v. Commissioner, 215 Mass., 353, 102 N. E., 362; Hill v. Mayor, 193 Mass., 574, 79 N. E., 825; Ross Township v. Michigan United R. Co., 165 Mich., 35, 130 N. W., 358; Van Akin v. Dunn, 117 Mich., 423, 75 N. W., 938; People v. City of Rock Island, 215 Ill., 493, 106 Am. St., 179, 74 N. E., 437; Hooper v. Rooney, 293 Ill., 370, 127 N. E., 713; State v. Graves, 91 Ohio St., 38, 109 N. E., 590; State v. Winterrowd, 174 Ind., 592, 30 L. R. A. (N. S.), 887, 91 N. E., 956, 92 N. E., 650; Board of Excise of Okla. Co. v. Board of Directors of School District 27 of Okla. Co., 31 Okla., 558, Ann. Cases, 1913 E, 369, 122 Pac., 520; Wiedwald v. Dodson, 95 Cal., 453, 30 Pac., 580.

This court announced in an opinion of Chief Justice Gaines that mandamus " is an extraordinary writ and rests largely in the discretion of the court." Munson v. Terrell, 101 Texas, 220, 105 S. W., 1114.

None of these cases can be rightly construed as affirming that the remedy afforded by the award of a mandamus depends upon arbitrary action by the court. On the contrary, the discretion referred to is a judicial discretion to be exercised in the application of fixed principles. It is because these principles require the determination of the existence of many incidents, some of which are of an unusual nature, as well as the non-existence of others, as conditions precedent to the writ's issuance, and because such determination is impossible without the exercise of judicial discretion, in the light of the peculiar facts of each proceeding, that the writ is correctly classified as discretionary. 26 Cyc. 143 to 145.

Our statute empowers this Court to issue writs of mandamus "agreeable to the principles of law regulating such writs." Art. 1526, Vernon's Sayles' Texas Civil Statutes.

Among the principles regulating the issuance of writs of mandamus, which cannot be regarded otherwise than as clearly settled, is one which is thus stated in section 1380 of Spelling's Extraordinary Relief: "While the remedy by mandamus is not equitable but strictly legal, yet by analogy to the principles prevailing in courts of equity, it is a uniform requirement that the relator in seeking this remedy must come into court with clean hands." To the same effect, see sec. 26, High's Extraordinary Legal Remedies.

Justice Lamar, speaking for the Supreme Court of the United States, announces the rule to be that "mandamus will not be granted in aid of those who do not come into court with clean hands," since the writ issues "to remedy a wrong and not to promote one." Turner v. Fisher, 222 U. S., 209, 56 L. Ed., 165, 32 Sup. Ct., 38. See also Nevell v. Terrell, 99 Texas, 356, 87 S. W., 659, 89 S. W., 971; Hale

v. Risley, 69 Mich., 598, 37 N. W., 570; United States ex Rel. Stevens v. Richards, 33 App. D. C. 418, 419.

The rule that he who seeks a mandamus must present his application with clean hands has no different meaning from the general maxim in equity that "he who comes into equity must come with clean hands." Professor Pomeroy states the meaning of the maxim as follows: "It says that whenever a party, who, as *actor,* seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith, or other equitable principle in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere in his behalf, to acknowledge his right, or to award him any remedy." He adds: "It is not alone fraud or illegality which will prevent a suitor from entering a court of equity; any really unconscientious conduct, connected with the controversy to which he is a party, will repel him from the forum whose foundation is good conscience." I Pomeroy's Equity Jurisprudence, secs. 397, 404.

Having concluded that the petition of relators is grounded on conduct amounting to an invitation to, and hence participation in an act violative of good faith and of conscience, it follows that relators did not come into court with clean hands, as required to entitle them to the relief prayed for, and hence the mandamus is denied.

Opinion delivered January 5, 1921.

(Chief Justice Phillips concurs in the refusal of the mandamus, but not the holding of the opinion, and will file a separate opinion.)

Mr. Chief Justice PHILLIPS, concurring in the result, but on different grounds, delivered the following opinion.

When on motion leave was originally sought for the filing of this proceeding, I objected to the granting of the motion. It was clear to my mind that the relators had no right to a mandamus for the placing of Mr. Fuller's name on the official ballot as a candidate for District Judge in opposition to Judge Street, the nominee of the Democratic party for the position, selected in the preceding primary election; it being shown that Fuller participated in the primary election as a Democrat and subscribed to the pledge that he would support its nominees at the general election. It seemed to me then, as it does now, an absurdity to say that a man could enter a party primary; subscribe to the pledge and obligation imposed by the statute law, to support the nominees of the primary; thereby obtain the right to participate in the primary; and then in the general election could lawfully become a candidate against a nominee of the primary. This conclusion was reached by determining, not whether there was anything unmoral about Fuller's candidacy, but whether it was lawful. That, in my opinion, was the only thing to determine about it. It

was in open disregard of the obligation of a valid, a plain, and a vital statute. It was therefore in my judgment unlawful.

In the refusal of the mandamus, I therefore of course concur. But the case, in my opinion, is not to be disposed of upon any such ground as that advanced for the decision by the majority of the court.

Fuller's candidacy was either lawful or unlawful. The right to this mandamus should be decided accordingly.

If it was lawful, as it seems to me the majority opinion inevitably declares it, since according to its holding Fuller could become the candidate without violating any legal obligation or right, it should not be denied because in the view of the court there was merely something bad about the morals of it.

A court, it is true, has a discretion in respect to the awarding of a mandamus. But the right to so vital a thing as candidacy for public office should not depend upon a court's view of its morality. It should depend alone upon the written law, and should be judged alone according to the law.

In a free country, any man, in the absence of a disqualifying statute, has the right to run for public office. Under free institutions, if his candidacy be not prohibited by positive law, it should not be denied.

If as tested by the law it is rightful, and is wrongful only as tested by morals, the ballot is the best place to settle the equities of it.

If it be only in breach of good faith, but not in breach of any law, and is to be condemned only in conscience, the voters at the election may be, and should be, trusted to attend to its moral phases. I do not think a court should concern itself with them.

The decision of the majority is that the obligation imposed by the statute, requiring a participant in a primary election to subscribe to a pledge that he will support the nominees of the primary, is only a moral obligation. This is in accord with their holding in the Woman Suffrage Case, in answer to the proposition there urged that the statute making women eligible to vote in primary elections was invalid because they would necessarily be required to take this pledge, a pledge they could not perform; since, admittedly, they could not at that time vote in general elections. It is now said in this majority opinion that the proper interpretation of the phrase "to support the nominee," as intended by the Legislature in exacting it of women voters, is "to uphold by aid or countenance."

The pledge required by the statute can not well have one meaning for men voters, and another for women voters. It has never had but one primary meaning; and that is, "to vote" for the nominee in the general election. A party nominee, with an opposing candidate against him, would be in an enviable position in a general election with just the "countenance" of his party associates. He would

doubtless have a new sense of the value of his nomination. Where the rivalry of parties was strong, the eagerness with which a party nomination would be sought under this interpretation of the duty of the party membership, can be left to the imagination.

The decision further is, that though the relators are independent voters, having in nowise taken part in the primary election, and are shown here to have fully complied with the law governing the proposal by independent voters of an independent candidate, they are not before the court with "clean hands," since Fuller's becoming such a candidate even at their instance and petition, while not a violation of any legal duty, would be a breach by him of good faith.

The relators are seeking the mandamus here; not Fuller. The relators have not breached any faith. They were under no kind of obligation to Judge Street or to the political party which nominated him in the primary. They were under no duty not to oppose him in the general election with a candidate of their own. Their right to Mr. Fuller as their candidate would be equal to the right of the Democratic party to Judge Street as its candidate, if there were nothing in the law making the candidacy of Mr. Fuller illegal. Nothing can be held in my opinion as denying them this right and disqualifying and barring their candidate, but the written law. Nothing but the written law should be interposed between them and that right. The decision means that if Fuller had privately solicited Judge Street to become a candidate and promised him support, the relators should be denied the right to propose him as an independent candidate, though the law did not forbid Fuller's candidacy and he was under no legal obligation not to become a candidate. There is no difference in morals between a man's violation of his private word and his violation of his public word.

The sole ground of the decision is that the hands of relators are to be regarded as "unclean" because Fuller's candidacy would be a violation of his public word—not a violation of a legal duty. I do not consider the condition of the relators' hands as the real question in the case, or, in view of the real question, of any importance.

The true question is whether Fuller's candidacy would violate a legal right of Judge Street as the nominee of the primary in which Fuller participated,—a right entitled to the law's protection. If it would violate no such right, it is difficult to see how a court has any authority to interdict it or deny it legal standing.

The question must be determined by the nature of Fuller's duty in the premises. The nature of a right which issues from a duty, is necessarily that of the duty. If Fuller's obligation not to become an opposing candidate was only a moral obligation, the corresponding right of Judge Street to be unopposed by his candidacy could not be other than a moral right. It would be a legal right—a right

entitled to the law's protection, only because of Fuller's obligation being a legal obligation. This is the whole of the case. The law will not enforce purely moral obligations. It enforces, and can enforce, only legal obligations.

The importance of the decision therefore becomes manifest. It involves, not only whether duties and obligations imposed by valid laws are to be classed by this court as only of moral force, but the far-reaching question as to whether a party nomination under our statutes has any legal standing or integrity as against the candidacy of one pledged and bound by them to support and not oppose the nominee.

The effect of the opinion of the majority of the court is to announce that any one taking part in the primary is thereafter legally free to oppose such a nominee, even to becoming a rival candidate; that in the eyes of the law he is free to destroy and defeat the very purpose of the primary; that the law will require of him a solemn obligation for a fair and lawful purpose, and in the same breath absolve him from all legal duty to respect it.

While my protest is futile, I emphatically dissent from a holding by this court which deprives these statutes of all their strength and by which the primary system of this State, as safe-guarded by them, is virtually stricken down.

The purpose of a primary is not alone to make a choice of party candidates. It is to make a choice binding upon the party membership, particularly those who participate in the primary, whereby the strength of the party will be combined and unified for the success of its nominees at the general election. Each member of the party is entitled to vote his preference in the primary. But the essence of the primary is its binding effect upon those who enter it. No one is obliged to enter it, but if a party member does not expect to be both morally and legally bound to respect its result, he ought to stay out of it. The consideration for his agreement to vote for its nominees is the benefit accruing to him from the same agreement made by all the other party members participating, whereby the ultimate election of his choice of candidates, if selected in the primary, will be furthered, and, at all events, the party will be afforded in the general election a united voting force for the election of its nominees. As a loyal member of the party he is supposed to be concerned in the success of its nominees, whether they be the choice he expressed in the primary or not.

The primary is a barren, useless proceeding unless it binds those who take part in it, to vote for its nominees. Because of this palpable fact, the statute requires that those entering it pledge themselves to so vote. Only by making this pledge are they entitled to take part in it.

If in the face of this statute one who makes that pledge is only morally, but not legally, bound to observe it, the statute is a farce. It means that the statute has no virtue as a law, but is only a moral sanction. It was not needed as a moral sanction. It would be bad morals to violate such a pledge though there were no statute on the subject. The moral obligation would exist without the statute. Then why write a statute to express it? The statute could not create the moral obligation. Nor could the statute add anything to it. Legislatures cannot create moral obligations, nor impose them as such. That belongs to a higher power. Statutes are not written with any such design. They deal with legal obligations or duties and legal rights. Unless intended to have the full force of a law; to express the command of the sovereignty of the State as a rule, not advisory, but imperative; to impose, not an obligation purely moral and belonging exclusively to the tribunal of conscience, but a duty cognizable in the forums of the law; and to create a corresponding right which the law will recognize, maintain and protect, the statute might as well never have been written.

There is a marked difference between the moral law and municipal law. The moral law is of divine origin. Municipal law is a human institution. The moral law is compulsory upon all persons in their relations with each other and in their duties to each other and to their Maker. Broadly speaking, it is the foundation of municipal law. Many of the latter's rules and doctrines proceed from its principles and reflect them. But much of municipal law arises from considerations other than pure morals—from the importance of certainty, from expedience in many instances, and from the necessity for rules in accord with the average conduct of mankind. At certain periods the common law included many arbitrary rules, sometimes pure dogmas, in which there was no semblance of morality. For some of those ancient rules Lord Coke said no reason, even, could be given and none was supposed to be given. Therefore, the precepts of the moral law, except as the municipal law has embodied them and diffused them through its own doctrines and statutes, are left for their enforcement to the individual conscience. As purely moral obligations they essentially belong to the realm of conscience. There are many moral duties that are not legal duties. There are many legal duties—made so by the common law and particularly by the statute law—that are not moral duties.

But whether moral duties or not, once they are imposed by a valid statute, they become legal duties. The object of the statute in such case is to make them legal duties, resting no longer alone in moral authority, but imposed as legal obligations as a part of the law of the land and conferring legal rights upon those to whom they are owing—duties whose violation means something more than the mere

pains of conscience, but for whose infraction the law will provide a remedy, as it does, and must do, for the protection of every legal right.

It is inconceivable that a duty commanded or a right conferred by a valid statute may be denominated as only a moral duty or a moral right. Or that a valid statute is to be held as impotent to convert what may also be a moral duty into a legal duty.

Such a proposition simply reduces itself to a denial of the validity of the statute. The purpose of such a statute is plainly to make the duty one charged and commanded by law. Otherwise, it would not be made the subject of positive law. If it be a duty so commanded by law, it is a legal duty. It can have no other character, unless the power to command it by law be denied.

In actual effect, this is what the holding of the majority of the court comes to. The invalidity of the statute requiring the pledge is not expressly declared in their opinion, but it might as well be. The opinion intimates that. in their view the statute would be invalid, as an infringement of the right of free suffrage, if the duty to respect the pledge it requires be held a legal duty. Therefore, says the opinion, as avoiding question as to the statute's validity if held to impose a legal duty, it will be "construed" as charging only a moral duty.

There is nothing about the statute to construe. It is one of those statutes which do not admit of construction. If valid, it imposes a legal duty. If it does not impose such a duty, it is only because the Legislature was without the power to command the duty. Unless it imposes a legal duty, the statute is merely an impressive recital of the existing moral obligation, and is not entitled to be called a law. Holding it, by construction, as charging only a moral duty, denies the duty any legal nature and hence the statute any legal effect. This holding, therefore, merely means that question as to the statute's validity is to be avoided by an adopted construction which deprives it of any legal force.

There is no authority for holding a legislature to be without the power to enact a primary election statute requiring as a legal obligation such a pledge as this one. The constitutionality of such statutes has often been expressly affirmed. State v. Drexel, 74 Neb., 776, 105 N. W., 774; State v. Michel, 121 La., 374, 46 So., 430; Rebstock v. Superior Court, 146 Calif., 308; 80 Pac. 65. There is no suggestion in any decision that the obligation created by such a statute and the pledge under it, is only a moral obligation. State v. Michel (La.) plainly treats the primary voter's taking part in a statutory primary as itself creating a legal obligation to respect its result and support its nominees. It is in that view that it is said in that opinion that the statute requiring him to so agree "did

not undertake *to add* anything to his legal obligation." The legal obligation was recognized as existing and as growing out of participation in the statutory primary.

Aside from authority, such a statutory pledge cannot, in reason, be held invalid because there is imposed a legal duty to respect it. Agreement by the primary voter to support its nominees by voting for them, is absolutely essential to the integrity of the primary. Unless it so binds those taking part, it is without purpose or effect. The constitutionality of the primary as a method for making party nominations, with this as its aim and end, has never been denied. To allow participation in the primary without such agreement and its performance would result in the disruption of any party. A law which would countenance a voter's right to enter a primary and his perfect freedom thereafter to destroy and defeat its very purpose, would be void on its face.

With the primary voter clearly without any right to enter the primary unless he agrees to abide its result and support its nominees, how, in reason, is any constitutional right of his impaired by a statute which, in subjecting the primary to the control of the law, requires, if he does enter it, such agreement of him as a legal obligation. With the primary recognized as a constitutional method of making party nominations, and such agreement by the primary voter being the essence of the system, how can it be unconstitutional to impose performance of the agreement as a legal duty? How is any right of suffrage denied by such a requirement?

None is denied. There is no abridgment of the right to vote. Nor of the right to vote just as the voter contemplated when he entered the primary. The primary is only a pre-determination by him of his choice of candidates, in which he willingly participates and takes an active part. It is a lawful method for the selection of the candidate of his party, and of himself as a member of the party. He is under no compulsion to adopt it as a method. He has a right to stay out of the primary. But if for purposes of his own and to subserve his interest as a voter he enters the primary, and in common with the other members of his party makes use of it for the selection of a candidate to be voted for by him at the general election, he would be in poor position to say that his voluntary adoption of the method operated as an abridgment of his right of suffrage. Having availed himself of it in aid of that right, he would not be heard to say that its just obligations were an impairment of the right.

The integrity of the primary as a common and lawful method of the people for making party nominations is a matter of constitutional concern, as well as the right of suffrage. A reasonable law which only fairly protects the primary, as does the requirement of this statutory pledge in imposing a just legal duty upon the primary

voter, cannot be considered as any abridgment of the right of suf-
frage.

That a statute imposing a given duty does not provide a criminal
penalty for the violation of the duty, or even a civil penalty, does
not change the nature of the duty. There are many legal duties,
imposed by statute and not arising from a statute, for whose breach
no express penalty is provided. Nor is the nature of the particular
duty altered because on account of certain features of it or peculiar
circumstances, the law will leave its breach to other remedy than
specific performance. There are many legal duties of this class,
also.

But the rights which grow out of and are founded upon all such
duties, whether those for whose breach no penalty is provided, or
those whose specific performance will not be enforced, the law will
protect, and for their protection afford appropriate remedy. It
does so only for the reason that the duty from which the correspond-
ing right proceeds, is a legal duty. In this way the law compels ob-
servance of the duty. It is to be presumed that it will provide an
appropriate remedy for the breach of every duty which it rightfully
imposes.

Let it be supposed, for illustration, that instead of this applica-
tion for the certification of Fuller's name as an independent candidate
being refused by the Secretary of State, it had been granted and
Fuller had acquired the full status of such a candidate. Is it to be
doubted that Judge Street, as the nominee of a primary in which
Fuller had participated and taken the pledge required by the statute,
would be entitled to the law's protection of his candidacy from such
unlawful candidacy on the part of Fuller? Or that the law would
fail in a remedy for its protection?

To what end have these nominations been subjected to the law's
control and regulation if the law will not safe-guard their integrity
by protecting the rights of those who obtain them? If a right con-
ferred or recognized by statute is not to be protected, defended and
enforced by appropriate legal method, then we must abolish the max-
im that the law will grant no right and permit no wrong without a
remedy.

In Gilmore v. Waples, 108 Texas, 167, 188 S. W., 1037, the nature
of the rights growing out of these primary election statutes was
discussed. It was there held, not that they are moral rights, but
that they are *legal rights,* because founded upon the statute law, and
as such entitled to the law's protection.

In the illustration just given, the right of Judge Street so entitled
to protection would proceed only from its character as a legal right—
a legal right growing out of Fuller's legal duty under the statutory
pledge, not to oppose him as a candidate, but to vote for him. Why?

Not because of any statute expressly forbidding Fuller's candidacy under such circumstances, since there is no such express statute, but for the reason that the statute requiring the pledge and his giving it in the primary as effectually prohibits his opposing candidacy as would a statute so written in terms.

If the statute does not have that effect, it has no effect. It required that Fuller agree to support the nominee. He did so agree in obedience to the statute, as the means of entering the primary. Judge Street as the nominee became a beneficiary of the agreement and Fuller's obligation to respect it. In virtue of the statute the duty to perform the agreement became a legal duty; the right of Judge Street as a beneficiary of the duty became a legal right; and it would command the law's protection, as any other legal right.

But the law does not enforce purely moral obligations. They create no legal rights. Hence in such a situation as is above instanced, if Fuller's obligation be only a moral one there would be presented the anomaly of an utter denial of any legal redress for the protection of a nominee under the statute against the opposing candidacy of one who as a participant in the primary was by the statute pledged and bound not only not to oppose him, but to support and vote for him. These statutes are a travesty if such a result may have their sanction.

They do not give any such sanction, as this Court distinctly declared in Gilmore v. Waples. They do not, because the rights they confer and the duties they impose are legal rights and legal duties. Those rights and duties could be nothing else and be the subjects of the statute law of the State.

Opinion filed Jan. 10, 1921.