RAY, CHAIRMAN OF THE STATE DEMOCRATIC
EXECUTIVE COMMITTEE OF
ALABAMA, *v.* BLAIR.

No. 649. Argued March 31, 1952.—Decided April 3, 1952.—
Opinions filed April 15, 1952.

*Marx Leva* and *Harold M. Cook* argued the cause for petitioner. With them on the brief were *James J. Mayfield, George A. LeMaistre* and *Louis F. Oberdorfer.*

*Horace C. Wilkinson* argued the cause and filed a brief for respondent.

MR. JUSTICE REED delivered the opinion of the Court.

The Supreme Court of Alabama upheld a peremptory writ of mandamus requiring the petitioner, the chairman of that state's Executive Committee of the Democratic Party, to certify respondent Edmund Blair, a member of that party, to the Secretary of State of Alabama as a candidate for Presidential Elector in the Democratic Primary to be held May 6, 1952. Respondent Blair was admittedly qualified as a candidate except that he refused to include the following quoted words in the pledge required of party candidates—a pledge to aid and support "the nominees of the National Convention of the Democratic Party for President and Vice-President of the United States." The chairman's refusal of certification was based on that omission.

The mandamus was approved on the sole ground that the above requirement restricted the freedom of a federal elector to vote in his Electoral College for his choice for President. 257 Ala. ——, 57 So. 2d 395. The pledge was held void as unconstitutional under the Twelfth Amend-

ment of the Constitution of the United States.[1] Because the mandamus was based on this federal right specially claimed by respondent, we granted certiorari. 28 U. S. C. § 1257 (3); 343 U. S. 901.

On account of the limited time before the primary election date, this Court ordered prompt argument on March 31, 1952, after granting certiorari and handed down a *per curiam* decision on April 3, 343 U. S. 154, stating summarily our conclusion on the federal constitutional issue that determined the Alabama judgment. This opinion is to supplement that statement. Our mandate issued forthwith.

The controversy arose under the Alabama laws permitting party primaries. Title 17 of the Code of Alabama, 1940, as amended, provides for regular optional primary elections in that state on the first Tuesday in May of even years by any political party, as defined in the

---

[1] U. S. Const., Amend. XII:

"The Electors shall meet in their respective states, and vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves; they shall name in their ballots the person voted for as President, and in distinct ballots the person voted for as Vice-President, and they shall make distinct lists of all persons voted for as President, and of all persons voted for as Vice-President, and of the number of votes for each, which lists they shall sign and certify, and transmit sealed to the seat of the government of the United States, directed to the President of the Senate;—The President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted;—The person having the greatest number of votes for President, shall be the President, if such number be a majority of the whole number of Electors appointed; and if no person have such majority, then from the persons having the highest numbers not exceeding three on the list of those voted for as President, the House of Representatives shall choose immediately, by ballot, the President. . . ."

chapter, at state cost. §§ 336, 337, 340, 343. They are subject to the same penalties and punishment provisions as regular state elections. § 339. Parties may select their own committee in such manner as the governing authority of the party may desire. § 341. Section 344 provides that the chairman of the state executive committee shall certify the candidates other than those who are candidates for county offices to the Secretary of State of Alabama. That official, within not less than 30 days prior to the time of holding the primary elections, shall certify these names to the probate judge of any county holding an election.

Every state executive committee is given the power to fix political or other qualifications of its own members. It may determine who shall be entitled and qualified to vote in the primary election or to be a candidate therein. The qualifications of voters and candidates may vary.[2]

Section 348 requires a candidate to file his declaration of candidacy with the executive committee in the form prescribed by the governing body of the party. There is a provision, § 350, which reads as follows: "At the bottom of the ballot and after the name of the last candidate shall

---

[2] Ala. Code, 1940, Tit. 17, § 347:

"All persons who are qualified electors under the general laws of the State of Alabama, and who are also members of a political party entitled to participate in such primary election, shall be entitled to vote therein and shall receive the official primary ballot of that political party, and no other; but every state executive committee of a party shall have the right, power and authority to fix and prescribe the political or other qualifications of its own members, and shall, in its own way, declare and determine who shall be entitled and qualified to vote in such primary election, or to be candidates therein, or to otherwise participate in such political parties and primaries; and the qualifications of electors entitled to vote in such primary election shall not necessarily be the same as the qualifications for electors entitled to become candidates therein; . . . ."

be printed the following, viz: 'By casting this ballot I do pledge myself to abide by the result of this primary election and to aid and support all the nominees thereof in the ensuing general election.' "

On consideration of these sections in other cases the Supreme Court of Alabama has reached conclusions generally conformable to the current of authority. Section 347 has been said by the Supreme Court of Alabama in *Ray* v. *Garner*, 257 Ala. ——, 57 So. 2d 824, 826, decided March 27, 1952, to give full power to the state executive committee to determine "who shall be entitled and qualified to vote in primary elections or be candidates or otherwise participate therein . . . just so such Committee action does not run afoul of some statutory or constitutional provision."

The *Garner* case involved a pledge adopted by the State Democratic Executive Committee for printing on the primary ballot, reading as follows:

> "By casting this ballot I do pledge myself to abide by the result of this Primary Election and to aid and support all the nominees thereof in the ensuing General Elections. I do further pledge myself to aid and support the nominees of the National Convention of the Democratic Party for President and Vice-President of the United States." 257 Ala., at ——, 57 So. 2d, at 825.

This is substantially the same pledge that created the controversy in this present case. The court also called attention approvingly to *Lett* v. *Dennis,* 221 Ala. 432, 433, 129 So. 33, 34, a case that required a candidate in the primary to follow a party requirement and make a public oath as to his vote in the past general election, where it was declared "a test by a political organization of party affiliation and party fealty is reasonable and proper to be prescribed for those participating in its primary elections

for nomination of candidates for office." [3]   As to the power
to prescribe tests for participation in primary elections, it
was added in the *Garner* case that "in Alabama this pre-
rogative is vested in the State Party Executive Committee,
acting through its duly elected or chosen members. *Smith*
v. *McQueen,* [232 Ala. 90, 166 So. 788]." [4]   257 Ala., at
——, 57 So. 2d, at 826.   The *McQueen* case involved the

---

[3] See Merriam and Overacker, Primary Elections (1928), pp. 69–73,
124, 125.   Cf. *State ex rel. Curyea* v. *Wells,* 92 Neb. 337, 138 N. W.
165; *Francis* v. *Sturgill,* 163 Ky. 650, 174 S. W. 753.

[4] This was not a unique delegation.   In 1928 Merriam and Over-
acker cited ten other states which delegate to the party authorities
the right to prescribe such qualifications, with or without a statutory
statement of minimum qualifications; these ten were Delaware, Idaho,
and the remainder of the "solid South," except North Carolina.   See
Merriam and Overacker, *supra,* note 3, at pp. 72–73.   In 1948
Penniman reports the continued existence of these delegations in
all these states except Idaho, which now apparently requires only
that the candidate "represent the principles" of the party and be
duly registered in the appropriate precinct.   6 Idaho Code (Bobbs-
Merrill, 1948) §§ 34–605, 34–606, 34–614.   See Penniman, Sait's
American Parties and Elections (4th ed., 1948), p. 431.   However,
the situation has changed in several of those states: the South Caro-
lina legislature apparently no longer regulates the conduct of pri-
maries at all, see S. C. Acts 1944, No. 810, p. 2323; and Texas and
Florida have repealed their election codes and enacted new ones
which appear to lack any comparable provision, see The New Elec-
tion Code, Vernon's Annotated Texas Statutes Service (1951), effec-
tive January 1, 1952; Fla. Laws 1951, c. 26870.   In both Texas and
Florida, the primary is open to party "members"; the extent to
which the party itself may prescribe membership qualifications is not
explicitly set forth.   But cf. §§ 103.111 (3) and 103.121, Fla. Laws
1951, c. 26870.

For provisions in the remaining states bearing on this delegation,
see 2 Ark. Stat. Ann. (Bobbs-Merrill, 1948) § 3–205; 12 Ga. Code
Ann. (Harrison, 1936) § 34–3218.2; Va. Code, 1950 (Michie, 1949),
§§ 24–367, 24–369; 3 Miss. Code Ann., 1942 (Harrison, 1943), § 3129;
Del. Laws 1944–1945, c. 150, amending Del. Rev. Code, 1935, c. 58,
1782, § 14; La. Rev. Stat., 1950, Tit. 18, §§ 306, 309; La. Const. Ann.
(Bobbs-Merrill, 1932), Art. 8, § 4.

selection of delegates to a national political convention. It was also said in *Ray* v. *Garner* concerning the voter's pledge that:

> "Primarily, the pledge must be germane to party membership and party elections and, while the last clause of the pledge pertains to the national party, the party in Alabama will be a part of it by sending delegates to participate in the national convention, the Executive Committee having ordered their election and the party thereby having signified its intention to become a member of the national party. Therefore, it was within the competency of the Committee to adopt the resolution so binding the voters in the primary." [5]  257 Ala., at ——, 57 So. 2d, at 826.

As is well known, political parties in the modern sense were not born with the Republic.  They were created by necessity, by the need to organize the rapidly increasing

---

[5] Such a holding integrates the state and national party.  See Cannon's Democratic Manual (1948):

"The Democratic National Committee is the permanent agency authorized to act in behalf of the Party during intervals between Conventions.  It is the creature of the National Convention and therefore subordinate to its control and direction.  Between Conventions the Committee exercises such powers and authority as have been delegated specifically to it and is subject to the directions and instructions imposed by the Convention which created it."  P. 4.

"Duties and Powers of the Committee

"The duties and powers of the National Committee are derived from the Convention creating it, and while subject to variation as the Convention may provide, ordinarily include:

> . . . . .

"8. Provision for the National Convention, involving:

> . . . . .

"b. Authorization of call and determination within authority granted by last National Convention of representation from States, Territories and Districts; . . . ."  Pp. 7–8.

population, scattered over our Land, so as to coordinate efforts to secure needed legislation and oppose that deemed undesirable. Compare Bryce, Modern Democracies, p. 546. The party conventions of locally chosen delegates, from the county to the national level, succeeded the caucuses of self-appointed legislators or other interested individuals. Dissatisfaction with the manipulation of conventions caused that system to be largely superseded by the direct primary. This was particularly true in the South because, with the predominance of the Democratic Party in that section, the nomination was more important than the election. There primaries are generally, as in Alabama, optional.[6] Various tests of party allegiance for candidates in direct primaries are found in a number of states.[7] The requirement of a pledge from the candidate participating in primaries to support the nominee is not unusual.[8] Such a provision protects a party from in-

[6] See Penniman, *supra,* n. 4, cc. XIII, XVIII, especially at pp. 300, 416; Merriam and Overacker, *supra,* n. 3, at pp. 92–93.

[7] Penniman, *supra,* pp. 425–426; Merriam and Overacker, *supra,* pp. 129–133.

[8] *E. g.,* § 4, c. 109, N. D. Laws 1907, pp. 151, 153, discussed in *State ex rel. McCue* v. *Blaisdell,* 18 N. D. 55, 118 N. W. 141. See 7 Fla. Stat. Ann. (Harrison, 1943) § 99.021 (pkt. pt.); Fla. Laws 1951, c. 26870, § 99.021, amending 7 Fla. Stat. Ann. (Harrison, 1943) § 102.29, discussed in *Mairs* v. *Peters,* 52 So. 2d 793. Cf. 3 Miss. Code Ann., 1942 (Harrison, 1943), § 3129; *Ruhr* v. *Cowan,* 146 Miss. 870, 112 So. 386. Cf. Va. Code, 1950 (Michie, 1949), §§ 24–367, 24–369. See *Westerman* v. *Mims,* 111 Tex. 29, 227 S. W. 178, discussing Art. 3096 of Tex. Rev. Stat. of 1911; cf. *Love* v. *Wilcox,* 119 Tex. 256, 28 S. W. 2d 515.

For an example of a pledge specifically directed toward primary candidates for the office of presidential elector, see the resolutions of the State Democratic Committee of Texas discussed in *Carter* v. *Tomlinson,* 149 Tex. 7, 227 S. W. 2d 795; see also *Love* v. *Taylor,* 8 S. W. 2d 795 (Tex. Civ. App.); *McDonald* v. *Calhoun,* 149 Tex. 232, 231 S. W. 2d 656; cf. *Seay* v. *Latham,* 143 Tex. 1, 182 S. W. 2d 251. See also the pledge required by the Democratic Party of

trusion by those with adverse political principles.[9]  It was under the authority of § 347 of the Alabama Code, note 2, *supra*, that the State Democratic Executive Committee of Alabama adopted a resolution on January 26, 1952, requiring candidates in its primary to pledge support to the nominees of the National Convention of the Democratic Party for President and Vice-President.  It is this provision in the qualifications required by the party under § 347 which the Supreme Court of Alabama held unconstitutional in this case.

The opinion of the Supreme Court of Alabama concluded that the Executive Committee requirement violated the Twelfth Amendment, note 1, *supra*.  It said:

"We appreciate the argument that from time immemorial, the electors selected to vote in the college have voted in accordance with the wishes of the party to which they belong.  But in doing so, the effective compulsion has been party loyalty.  That theory has

---

Arkansas, discussed in *Fisher* v. *Taylor*, 210 Ark. 380, 196 S. W. 2d 217.

Similar pledges, of course, are frequently exacted of voters in the primaries.  See, *e. g.*, *State ex rel. Adair* v. *Drexel*, 74 Neb. 776, 105 N. W. 174; *Morrow* v. *Wipf*, 22 S. D. 146, 115 N. W. 1121; *Ladd* v. *Holmes*, 40 Ore. 167, 66 P. 714.  See Penniman, *supra*, note 4, at p. 431; Merriam and Overacker, *supra*, note 4, at pp. 124–129.

[9] See *Seay* v. *Latham*, 143 Tex. 1, 182 S. W. 2d 251.  This was a Texas case that allowed the Democratic Party of Texas to withdraw its nomination of presidential electors when they announced their determination to vote against the nominees of the party as made by the National Convention.  The names of others were substituted.  The court said:

"A political party is a voluntary association, instituted for political purposes.  It is organized for the purpose of effectuating the will of those who constitute its members, and it has the inherent power of determining its own policies."  143 Tex., at p. 5, 182 S. W. 2d, at 253.  See *Carter* v. *Tomlinson*, 149 Tex. 7, 13, 227 S. W. 2d 795, 798; 29 Tex. L. Rev. 378.

generally been taken for granted, so that the voting for a president and vice-president has been usually formal merely. But the Twelfth Amendment does not make it so. The nominees of the party for president and vice-president may have become disqualified, or peculiarly offensive not only to the electors but their constituents also. They should be free to vote for another, as contemplated by the Twelfth Amendment."[10] 257 Ala., at ——, 57 So. 2d, at 398.

In urging a contrary view the dissenting Alabama justices, in supporting the right of the Committee to require this candidate to pledge support to the party nominees, said:

"Any other view, it seems, would destroy effective party government and would privilege any candidate, regardless of his political persuasion, to enter a primary election as a candidate for elector and fix his

---

[10] The court found support for its conclusion in the reasoning of an Opinion of the Justices in answer to questions propounded by the Governor of Alabama in 1948. 250 Ala. 399, 34 So. 2d 598. One question was "Would an elector chosen at the general election in November 1948 have a discretion as to the persons for whom he could cast his ballot for President and Vice President?" Alabama had amended § 226 of Title 17 of its Code, relating to the meeting and balloting of its electoral college, by adding "and shall cast their ballots for the nominee of the national convention of the party by which they were elected." That opinion said:

"The language of the Federal Constitution clearly shows that it was the intention of the framers of the Federal Constitution that the electors chosen for the several states would exercise their judgment and discretion in the performance of their duty in the election of the president and vice-president and in determining the individuals for whom they would cast the electoral votes of the states. History supports this interpretation without controversy." 250 Ala., at 400, 34 So. 2d, at 600. See McPherson v. Blacker, 146 U. S. 1, 36. See also Willbern, Discretion of Presidential Electors, 1 Ala. L. Rev. 40.

On this review the right to a place on the primary ballot only is in contest.

own qualifications for such candidacy. This is contrary to the traditional American political system." 257 Ala., at ——, 57 So. 2d, at 403.

The applicable constitutional provisions on their face furnish no definite answer to the query whether a state may permit a party to require party regularity from its primary candidates for national electors.[11] The presidential electors exercise a federal function in balloting for President and Vice-President but they are not federal officers or agents any more than the state elector who votes for congressmen. They act by authority of the state that

---

[11] As both constitutional provisions long antedated the party primary system, it is not to be expected that they or their legislative history would illumine this issue. They do not. Discussion in the Constitutional Convention as to the manner of election of the President resulted in the arrangement by which presidential electors were chosen by the state as its legislature might direct. *McPherson* v. *Blacker,* 146 U. S. 1, 28.

The Twelfth Amendment was brought about as the result of the difficulties caused by the procedure set up under Art. II, § 1. Under that procedure, the electors of each state did not vote separately for President and Vice-President; each elector voted for two persons, without designating which office he wanted each person to fill. If all the electors of the predominant party voted for the same two men, the election would result in a tie, and be thrown into the House, which might or might not be sympathetic to that party. During the John Adams administration, we had a President and Vice-President of different parties, a situation which could not commend itself either to the Nation or to most political theorists.

The situation was manifestly intolerable. Accordingly the Twelfth Amendment was adopted, permitting the electors to vote separately for presidential and vice-presidential candidates. Under this procedure, the party electors could vote the regular party ticket without throwing the election into the House. Electors could be chosen to vote for the party candidates for both offices, and the electors could carry out the desires of the people, without confronting the obstacles which confounded the elections of 1796 and 1800. See 11 Annals of Congress 1289–1290, 7th Cong., 1st Sess. (1802).

in turn receives its authority from the Federal Constitution.[12]   Neither the language of Art. II, § 1, nor that of the Twelfth Amendment forbids a party to require from candidates in its primary a pledge of political conformity with the aims of the party.   Unless such a requirement is implicit, certainly neither provision of the Constitution requires a state political party, affiliated with a national party through acceptance of the national call to send state delegates to the national convention, to accept persons as candidates who refuse to agree to abide by the party's requirement.[13]

The argument against the party's power to exclude as candidates in the primary those unwilling to agree to aid and support the national nominees runs as follows: The constitutional method for the selection of the President and Vice-President is for states to appoint electors who shall in turn vote for our chief executives.   The intention of the Founders was that those electors should exercise their judgment in voting for President and Vice-President.   Therefore this requirement of a pledge is a restriction in substance, if not in form, that interferes with the performance of this constitutional duty to select the proper persons to head the Nation, according to the best judgment of the elector.   This interference with the

[12] U. S. Const., Art. II, § 1:

". . . Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector. . . ."

Twelfth Amendment, note 1, *supra; In re Green,* 134 U. S. 377, 379; *Burroughs* v. *United States,* 290 U. S. 534.

[13] The Supreme Court of Alabama has just said that the Democratic Party of that state was thus affiliated with the national organization. See the excerpt from *Ray* v. *Garner,* in the text at note 5, *supra.*

226

elector's freedom of balloting for President relates directly to the general election and is not confined to the primary, it is contended, because under *United States* v. *Classic,* 313 U. S. 299, and *Smith* v. *Allwright,* 321 U. S. 649, the Alabama primary is an integral part of the general election. See *Schnell* v. *Davis,* 336 U. S. 933. Although Alabama, it is pointed out, requires electors to be chosen at the general election by popular vote, Ala. Code, 1940, Tit. 17, § 222, the real election takes place in the primary. Limitation as to entering a primary controls the results of the general election.[14]

First we consider the impact of the *Classic* and *Allwright* cases on the present issues. In the former case, we dealt with the power of Congress to punish frauds in the primaries "[w]here the state law has made the primary an integral part of the procedure of choice." We held that Congress had such power because the primary was a necessary step in the choice of candidates for election as federal representatives. Therefore the sanctions of §§ 19 and 20 of the old Criminal Code, subsequently re-

[14] There is also a suggestion that, since the Alabama primary is an integral part of the general election, the Fourteenth Amendment, which among other prohibitions forbids a state to exclude voters on account of their color, also forbids a state to exclude candidates because they refuse to pledge their votes. The answer to this suggestion is that the requirement of this pledge, unlike the requirement of color, is reasonably related to a legitimate legislative objective— namely, to protect the party system by protecting the party from a fraudulent invasion by candidates who will not support the party. See note 9, *supra.* In facilitating the effective operation of democratic government, a state might reasonably classify voters or candidates according to party affiliations, but a requirement of color, as we have pointed out before, is not reasonably related to any legitimate legislative objective. *Nixon* v. *Herndon,* 273 U. S. 536. This requirement of a pledge does not deny equal protection or due process.

Furthermore, the Fifteenth Amendment directly forbids abridgment on account of color of the right to vote.

vised as 18 U. S. C. §§ 241 and 242, which forbade injury to constitutionally secured rights, applied to the right to vote in the primary. 313 U. S., at 317–321. In the latter, the problem was the constitutionality of the exclusion of citizens by a party as electors in a party primary because of race. We held, on consideration of state participation in the regulation of the primary, that the party exclusion was state action and such state action was unconstitutional because the primary and general election were a single instrumentality for choice of officers. The Fifteenth Amendment's prohibition of abridgment by a state of the right to vote on account of race made the exclusion unconstitutional. Consequently, under 8 U. S. C. §§ 31 and 43 an injured party might sue one injuring him. 321 U. S. 649, 660–664.

In Alabama, too, the primary and general elections are a part of the state-controlled elective process. The issue here, however, is quite different from the power of Congress to punish criminal conduct in a primary or to allow damages for wrongs to rights secured by the Constitution. A state's or a political party's exclusion of candidates from a party primary because they will not pledge to support the party's nominees is a method of securing party candidates in the general election, pledged to the philosophy and leadership of that party. It is an exercise of the state's right to appoint electors in such manner, subject to possible constitutional limitations, as it may choose. U. S. Const., Art. II, § 1. The fact that the primary is a part of the election machinery is immaterial unless the requirement of pledge violates some constitutional or statutory provision. It was the violation of a secured right that brought about the *Classic* and *Allwright* decisions. Here they do not apply unless there was a violation of the Twelfth Amendment by the requirement to support the nominees of the National Convention.

228

Secondly, we consider the argument that the Twelfth Amendment demands absolute freedom for the elector to vote his own choice, uninhibited by a pledge. It is true that the Amendment says the electors shall vote by ballot. But it is also true that the Amendment does not prohibit an elector's announcing his choice beforehand, pledging himself. The suggestion that in the early elections candidates for electors—contemporaries of the Founders—would have hesitated, because of constitutional limitations, to pledge themselves to support party nominees in the event of their selection as electors is impossible to accept. History teaches that the electors were expected to support the party nominees.[15] Experts in the history of government recognize the long-

---

[15] 11 Annals of Congress 1289–1290, 7th Cong., 1st Sess. (1802):

"Under the Constitution electors are to vote for two persons, one of whom does not reside in the State of the electors; but it does not require a designation of the persons voted for. Wise and virtuous as were the members of the Convention, experience has shown that the mode therein adopted cannot be carried into operation; for the people do not elect a person for an elector who, they know, does not intend to vote for a particular person as President. Therefore, practically, the very thing is adopted, intended by this amendment."

S. Rep. No. 22, 19th Cong., 1st Sess. (1826), p. 4:
"In the first election held under the constitution, the people looked beyond these agents [electors], fixed upon their own candidates for President and Vice President, and took pledges from the electoral candidates to obey their will. In every subsequent election, the same thing has been done. Electors, therefore, have not answered the design of their institution. They are not the independent body and superior characters which they were intended to be. They are not left to the exercise of their own judgment; on the contrary, they give their vote, or bind themselves to give it, according to the will of their constituents. They have degenerated into mere agents, in a case which requires no agency, and where the agent must be useless, if he is faithful, and dangerous, if he is not." See 2 Story on the Constitution (5th ed., 1891) § 1463.

standing practice.[16]   Indeed, more than twenty states do not print the names of the candidates for electors on the general election ballot.   Instead, in one form or another, they allow a vote for the presidential candidate of the national conventions to be counted as a vote for his party's nominees for the electoral college.[17]   This long-continued practical interpretation of the constitutional propriety of an implied or oral pledge of his ballot by a can-

---

[16] *McPherson* v. *Blacker,* 146 U. S. 1, 36:

"Doubtless it was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the Chief Executive, but experience soon demonstrated that, whether chosen by the legislatures or by popular suffrage on general ticket or in districts, they were so chosen simply to register the will of the appointing power in respect of a particular candidate." ·

III Cyclopedia of American Government (Appleton, 1914), Presidential Elections, by Albert Bushnell Hart, p. 8:

"In the three elections of 1788–89, 1792 and 1796 there was a liberal scattering of votes, 13 persons receiving votes in 1796; but in 1800 there were only five names voted on.   As early as 1792 an understanding was established between the electors in some of the different states that they should combine on the same man; and from 1796 on there were always, with the exception of the two elections of 1820 and 1824, regular party candidates.   In practice most of the members of the electoral colleges belonged to a party, and expected to support it; and after 1824 it became a fixed principle that the electors offered themselves for the choice of the voters or legislatures upon a pledge to vote for a predesignated candidate."

[17] *E. g.,* Massachusetts:

Annotated Laws of Massachusetts, c. 54:

"§ 43. Presidential Electors, Arrangement of Names of Candidates, etc.—The names of the candidates for presidential electors shall not be printed on the ballot, but in lieu thereof the surnames of the candidates of each party for president and vice president shall be printed thereon in one line under the designation 'Electors of president and vice president' and arranged in the alphabetical order of the surnames of the candidates for president, with the political designation of the party placed at the right of and in the same line with

didate for elector as to his vote in the electoral college weighs heavily in considering the constitutionality of a pledge, such as the one here required, in the primary.

However, even if such promises of candidates for the electoral college are legally unenforceable because violative of an assumed constitutional freedom of the elector under the Constitution, Art. II, § 1, to vote as he may choose in the electoral college, it would not follow that the requirement of a pledge in the primary is unconstitutional. A candidacy in the primary is a voluntary act of the applicant. He is not barred, discriminatorily, from participating but must comply with the rules of the party. Surely one may voluntarily assume obligations to vote for a certain candidate. The state offers him opportunity to become a candidate for elector on his own terms, although he must file his declaration before the primary. Ala. Code, Tit. 17, § 145. Even though the victory of an independent candidate for elector in Alabama cannot be anticipated, the state does offer the opportunity for the development of other strong political organizations where the need is felt for them by a sizable block of voters. Such parties may leave their electors to their own choice.

the surnames. A sufficient square in which each voter may designate by a cross (X) his choice for electors shall be left at the right of each political designation."

See S. Doc. No. 243, 78th Cong., 2d Sess. (1944), containing a summary of the state laws relating to nominations and election of presidential electors.

See Library of Congress, Legislative Reference Service, Proposed Reform of the Electoral College, 1950; Edward Stanwood, A History of the Presidency from 1788 to 1897 (1912), pp. 47, 48, 50, 51. The author shows the practice of an elector's announcing his preference and gives an alleged instance of violation.

See the comments on instruction of electors in State Law on the Nomination, Election, and Instruction of Presidential Electors, by Ruth C. Silva, 42 Am. Pol. Sci. Rev. 523.

We conclude that the Twelfth Amendment does not bar a political party from requiring the pledge to support the nominees of the National Convention. Where a state authorizes a party to choose its nominees for elector in a party primary and to fix the qualifications for the candidates, we see no federal constitutional objection to the requirement of this pledge.

MR. JUSTICE BLACK took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, not having heard the argument, owing to illness, took no part in the disposition of the case.

MR. JUSTICE JACKSON, with whom MR. JUSTICE DOUGLAS joins, dissenting.

The Constitution and its Twelfth Amendment allow each State, in its own way, to name electors with such personal qualifications, apart from stated disqualifications, as the State prescribes. Their number, the time that they shall be named, the manner in which the State must certify their ascertainment and the determination of any contest are prescribed by federal law. U. S. Const., Art. II, § 1, 3 U. S. C. §§ 1–7. When chosen, they perform a federal function of balloting for President and Vice President, federal law prescribing the time of meeting, the manner of certifying "all the votes given by them," and in detail how such certificates shall be transmitted and counted. U. S. Const., Amend. XII, 3 U. S. C. §§ 9–20. But federal statute undertakes no control of their votes beyond providing "The electors shall vote for President and Vice President, respectively, in the manner di-

rected by the Constitution," 3 U. S. C. § 8, and the Constitution requires only that they "vote by ballot for President and Vice-President, one of whom, at least, shall not be an inhabitant of the same state with themselves." U. S. Const., Amend. XII. No one faithful to our history can deny that the plan originally contemplated, what is implicit in its text, that electors would be free agents, to exercise an independent and nonpartisan judgment as to the men best qualified for the Nation's highest offices.* Certainly under that plan no state law could control the elector in performance of his federal duty, any more than it could a United States Senator who also is chosen by, and represents, the State.

This arrangement miscarried. Electors, although often personally eminent, independent, and respectable, officially became voluntary party lackeys and intellectual nonentities to whose memory we might justly paraphrase a tuneful satire:

> They always voted at their Party's call
> And never thought of thinking for themselves at all.

As an institution the Electoral College suffered atrophy almost indistinguishable from *rigor mortis*.

---

*See The Federalist, No. 68 (Earle ed., 1937), pp. 441-442:

"It was desirable that the sense of the people should operate in the choice of the person to whom so important a trust was to be confided. This end will be answered by committing the right of making it, not to any preëstablished body, but to men chosen by the people for the special purpose, and at the particular conjuncture.

"It was equally desirable, that the immediate election should be made by men most capable of analyzing the qualities adapted to the station, and acting under circumstances favorable to deliberation, and to a judicious combination of all the reasons and inducements which were proper to govern their choice. A small number of persons, selected by their fellow-citizens from the general mass, will be most likely to possess the information and discernment requisite to such complicated investigations."

However, in 1948, Alabama's Democratic Party Electors refused to vote for the nominee of the Democratic National Convention. To put an end to such party unreliability the party organization, exercising state-delegated authority, closed the official primary to any candidate for elector unless he would pledge himself, under oath, to support any candidate named by the Democratic National Convention. It is conceded that under long-prevailing conditions this effectively forecloses any chance of the State being represented by an unpledged elector. In effect, before one can become an elector for Alabama, its law requires that he must pawn his ballot to a candidate not yet named, by a convention not yet held, of delegates not yet chosen. Even if the nominee repudiates the platform adopted by the same convention, as Democratic nominees have twice done in my lifetime (1904, 1928), the elector is bound to vote for him. It will be seen that the State has sought to achieve control of the electors' ballots. But the balloting cannot be constitutionally subjected to any such control because it was intended to be free, an act performed after all functions of the electoral process left to the States have been completed. The Alabama Supreme Court held that such a requirement violates the Federal Constitution, and I agree.

It may be admitted that this law does no more than to make a legal obligation of what has been a voluntary general practice. If custom were sufficient authority for amendment of the Constitution by Court decree, the decision in this matter would be warranted. Usage may sometimes impart changed content to constitutional generalities, such as "due process of law," "equal protection," or "commerce among the states." But I do not think powers or discretions granted to federal officials by the Federal Constitution can be forfeited by the Court for disuse. A political practice which has its origin in custom must rely upon custom for its sanctions.

The demise of the whole electoral system would not impress me as a disaster. At its best it is a mystifying and distorting factor in presidential elections which may resolve a popular defeat into an electoral victory. At its worst it is open to local corruption and manipulation, once so flagrant as to threaten the stability of the country. To abolish it and substitute direct election of the President, so that every vote wherever cast would have equal weight in calculating the result, would seem to me a gain for simplicity and integrity of our governmental processes.

But the Court's decision does not even move in that direction. What it is doing is to entrench the worst features of the system in constitutional law and to elevate the perversion of the forefathers' plan into a constitutional principle. This judicial overturn of the theory that has come down to us cannot plead the excuse that it is a practical remedy for the evils or weaknesses of the system.

The Court is sanctioning a new instrument of power in the hands of any faction that can get control of the Democratic National Convention to make it sure of Alabama's electoral vote. When the party is in power this will likely be the administration faction and when not in power no one knows what group it will be. This device of prepledged and oath-bound electors imposes upon the party within the State an oath-bound regularity and loyalty to the controlling element in the national party. It centralizes party control and, instead of securing for the locality a share in the central management, it secures the central management in dominance of the local vote in the Electoral College. If we desire free elections, we should not add to the leverage over local party representatives always possessed by those who enjoy the prestige and dispense the patronage of a national administration.

The view of many that it is the progressive or liberal element of the party that will presently advantage from this device does not prove that the device itself has any

proper place in a truly liberal or progressive scheme of government. Who will come to possess this weapon and to whose advantage it will prove in the long run I am not foresighted enough to predict. But party control entrenched by disfranchisement and exclusion of nonconforming party members is a means which to my mind cannot be justified by any end. In the interest of free government, we should foster the power and the will to be independent even on the part of those we may think to be independently wrong.

Candidates for elector, like those for Senator, of course, may announce to their constituents their policies and preferences, and assume a moral duty to carry them out if they are chosen. Competition in the primary between those of different views would forward the representative principle. But this plan effects a complete suppression of competition between different views within the party. All who are not ready to follow blindly anyone chosen by the national convention are excluded from the primary, and that, in practice, means also from the election.

It is not for me, as a judge, to pass upon the wisdom or righteousness of the political revolt this measure was designed to suppress. For me it is enough that, be it ever so benevolent and virtuous, the end cannot justify these means.

I would affirm the decision of the Supreme Court of Alabama.