William **GELINEAU**, Gary E. Johnson, and Libertarian Party of Michigan, Plaintiffs,

v.

Ruth **JOHNSON**, Secretary of State of Michigan, in her official capacity, Defendant.

No. 1:12–cv–976.

United States District Court, W.D. Michigan, Southern Division.

Oct. 2, 2012.

Thomas S. Baker, Jason C. Miller, Miller Johnson PLC, Grand Rapids, MI, for Plaintiffs.

Denise C. Barton, Nicole Amber Grimm, MI Dept. Attorney General, Lansing, MI, for Defendant.

## OPINION AND ORDER DENYING MOTION FOR INJUNCTIVE RELIEF

PAUL L. MALONEY, Chief Judge.

Before the court is Plaintiffs' second motion for injunctive relief regarding the Libertarian Party's presence on the ballot in Michigan's rapidly approaching presidential election. In their first motion, Plaintiffs—the Libertarian Party of Michigan; Gary E. Johnson, the party's backup candidate for President; and William Gelineau, a Michigan citizen—sought to force Michigan's Secretary of State to include Gary E. Johnson on the ballot as the Libertarian Party's nominee for President. (ECF No. 3.) This court denied injunctive relief on laches grounds (ECF No. 11), and the Sixth Circuit affirmed (ECF Nos. 14–15).

In this latest motion, Plaintiffs raise claims regarding Judge James P. Gray, the Party's putative nominee for Vice President. (ECF No. 21.) In particular, they ask the court to ensure that the Secretary (1) keep proper records of "straight-ticket" votes cast for the Libertarian Party; (2) count such votes as votes for Gray for Vice President; and (3) print Gray's name on the ballot as the Libertarian Party's nominee for Vice President.

For the reasons discussed below, the court will deny Plaintiffs' motion.

I. **FACTUAL BACKGROUND**

On June 2, 2012, the Libertarian Party of Michigan held its state convention. The

Party nominated Gary Johnson, the former governor of New Mexico, as its candidate for President, and Judge James P. Gray as its candidate for Vice President. Johnson was an apparent recent convert to the Party. Before he switched in late 2011, Mr. Johnson had been running for President as a Republican, and his name had been listed on the Michigan Republican Party's primary ballot in early 2012.

Michigan law states that "[n]o person whose name was printed or placed on the primary ballots or voting machines as a candidate for nomination on the primary ballots of 1 political party shall be eligible as a candidate of any other political party at the election following that primary." Mich. Comp. Laws § 168.695. The Libertarian Party recognized that this provision, commonly known as the "sore-loser statute," potentially applied to Mr. Johnson. Indeed, as early as May 3, 2012, Michigan's Secretary of State took the position that she would refuse to include Gary Johnson's name on the ballot as the Libertarian Party's candidate.

To prepare for this possibility, the Libertarian Party of Michigan took what appears to be a novel step: it nominated a backup candidate. In particular, the Party nominated Gary E. Johnson, a Texas citizen, as its stand-in candidate in the event that the Secretary followed through on her resolution to keep the original Gary Johnson off the state general election ballot. On June 2, 2012, the Party certified their nomination(s) to the Secretary, as required by Mich. Comp. Laws § 168.686.

On June 25, 2012, the Libertarian Party of Michigan, along with Gary Johnson and Denee Rockman–Moon, chair of the Party and a Michigan voter, filed suit in the Eastern District of Michigan. Complaint, *Libertarian Party of Mich. v. Johnson*, No. 2:12–cv–12782 (E.D.Mich. June 25, 2012). The plaintiffs claimed that the sore-loser statute did not apply to Mr. Johnson, and that if it did, the statute would violate their First and Fourteenth Amendment rights. *Id.* At a motion hearing on September 6, 2012, District Judge Paul Borman granted the Secretary of State's motion to dismiss the plaintiffs' claims. Shortly thereafter, Judge Borman followed up with a written opinion. *Libertarian Party of Mich. v. Johnson*, No. 2:12–cv–12782, 905 F.Supp.2d 751, 2012 WL 3930557 (E.D.Mich. Sept. 10, 2012).

On September 7, the day after Judge Borman dismissed Gary Johnson's case, the Secretary of State (through Christopher Thomas, Michigan's Director of Elections) informed the Party that Gary E. Johnson's name would not appear on the ballot either. Mr. Thomas explained that "no provision of the Michigan Election Law authorizes a political party to nominate a contingent or stand-in candidate."

On September 11, 2012, the Libertarian Party of Michigan, Gary E. Johnson, and William Gelineau, a Michigan citizen who allegedly wishes to vote for Gary E. Johnson, filed suit in this court. (ECF No. 1.) Plaintiffs argue that the Party properly nominated Gary E. Johnson as its alternative candidate in case the Secretary of State refused to place Gary Johnson on the ballot, and that the Secretary's refusal to recognize Gary E. as such violates their rights under the First and Fourteenth Amendments to the United States Constitution. (*Id.*) Plaintiffs requested expedited consideration, noting that the Secretary planned to send ballots to the printers on September 13 or 14. The following day, Plaintiffs filed a motion for temporary restraining order. (ECF No. 3.) After ordering expedited briefing on the motion, this court declined to order injunctive relief, holding that Plaintiffs' claim was barred by laches. (ECF No. 11.) On

interlocutory appeal, the Sixth Circuit affirmed. (ECF No. 12.)

Nine days after this court denied the motion for injunctive relief, Plaintiffs amended their complaint to include allegations that Judge Gray was properly nominated for the vice-presidency. (ECF No. 18.) For his part, Plaintiff Gelineau alleges that he wishes to vote for Judge Gray for Vice President. (*Id.*) Along with their amended complaint, Plaintiffs filed a second motion for temporary restraining order and preliminary injunction asking the court to place Judge Gray on the ballot and to ensure that votes for him, or straight-ticket votes for the Libertarian Party, will be properly counted. (ECF No. 21.)

## II. LEGAL FRAMEWORK

In deciding whether to grant injunctive relief, a court must consider four factors: (1) whether the moving party demonstrates a strong likelihood of success on the merits; (2) whether the moving party would suffer irreparable injury without the order; (3) whether the order would cause substantial harm to others; and (4) whether the public interest would be served by the order. *Ohio Republican Party v. Brunner,* 543 F.3d 357, 361 (6th Cir.2008) (quoting *Northeast Ohio Coalition for Homeless and Serv. Emps. Int'l Union, Local 1199 v. Blackwell,* 467 F.3d 999, 1009 (6th Cir.2006)).

## III. DISCUSSION

### A. Laches

■ First, to the extent that Plaintiffs ask the court to modify Michigan's ballots to include Judge Gray, their motion fails for much the same reason as their first motion. Plaintiffs have known since early May that there was a substantial question about whether the Party's presidential nominee was eligible for the ballot. This itself should raise questions about the Party's vice-presidential nominee, and indeed, Plaintiffs state that they "contacted the Secretary numerous times about the status of its candidate, [though] the Secretary never addressed Judge Gray." In any case, Plaintiffs either knew or should have known that Michigan law does not provide for individual candidates for President or Vice President, but rather for party tickets consisting of a nominee for each position. At the very least, a substantial question about Judge Gray's candidacy has been clear for months. Yet Plaintiffs showed no diligence in asserting their rights until a mere 40 days before the election, after the state began printing ballots and indeed after their first motion to modify the ballots failed. The prejudice from this delay is even greater than that from Plaintiffs' first motion, and Plaintiffs make no serious effort to distinguish this situation. To the extent they seek to change the State's ballots, their claim fails under the doctrine of laches.

To the extent that Plaintiffs' claim survives, the court will address the merits of their argument below.

### B. Merits

Plaintiffs' argument is based on the following premises. They assert that the Party properly nominated Judge Gray as its candidate for Vice President, regardless of whether either Johnson was properly nominated for President. Therefore, Michigan law obligates the Secretary to place Judge Gray on the ballot. The Secretary's failure to do so, or to count straight-ticket Libertarian Party votes as votes for Judge Gray, would deny citizens such as Mr. Gelineau the right to vote for their candidate of choice. Further, the Party itself would suffer, if not through failure to elect its candidate, then through (unspecified) collateral consequences of re-

ceiving no votes for President and Vice President in the state's election. Finally, Plaintiffs argue, the State has no legitimate interest in keeping Judge Gray off the ballot. It therefore has no constitutional right to deny him votes and cannot claim any irreparable harm from the requested injunctive relief.

■ Plaintiffs' argument assumes that the ballot status of a political party's vice-presidential nominee is entirely independent of the status of its presidential nominee, and that nominating a candidate to only one of these two positions creates no particular legal problems. This is far from obvious, however. Indeed, the entire concept of an individual's vote for President or Vice President is a simplifying fiction. As every schoolchild learns (or should learn), the President and Vice President are elected not by the people of the United States directly, but by the Electoral College. Under the Constitution, each state is directed to appoint one elector for each Senator or Representative it elects to Congress. U.S. Const. art. II, § 1, cl. 2. (Washington D.C. currently gets three electors under the Twenty-third Amendment. U.S. Const. amend. XXIII, § 1.) Those electors then cast separate votes for President and Vice President. If a candidate receives a majority, he or she is declared the winner; if no one wins outright, the House of Representatives or Senate must choose a winner (for President and Vice President, respectively). U.S. Const. amend. XII.

Michigan, like most states, has adopted a winner-take-all system for appointing its electors. "The candidates for electors of president and vice-president who shall be considered elected are those whose named

have been certified to the secretary of state by that political party receiving the greatest number of votes for those offices at the next November election." Mich. Comp. Laws § 168.42. Those electors are then bound to vote for their party's nominees. Under state law, a person serving as an elector "consent[s] to cast his vote for the candidates for president and vice-president appearing on the Michigan ballot of the political party which nominated him." Id. § 168.47. "Refusal or failure [to do so] constitutes a resignation from the office of elector," and a substitute elector will be appointed. Id.[1]

Michigan's system makes no allowance for solo candidates—that is, a presidential nominee without a Vice President or a vice-presidential nominee without an accompanying President. Mich. Comp. Laws § 168.686 requires that the political parties certify to the Secretary of State "the typewritten or printed names of the candidates of that party for the offices of president of the United States and vice-president of the United States." Id. (emphasis added). Similarly, Michigan citizens are not able to vote for one party's candidate for President and another party's candidate for Vice President. Instead, they must vote for a party's ticket—both its presidential and vice-presidential candidates—as a whole. The state then appoints the slate of electors corresponding to the party that receives the most votes. Id. § 168.42. In their turn, the electors are bound to vote for "the candidates for president and vice-president . . . of the political party which nominated [them]." Id. § 168.47 (emphasis added). No part of this process allows for a solo presidential or vice-presidential candidate. Indeed,

---

**1.** Michigan is far from alone in binding its electors to vote for particular candidates. *See* John A. Zadrozny, *The Myth of Discretion: Why Presidential Electors Do Not Receive First* *Amendment Protection*, 11 CommLaw Conspectus 165, 179 nn. 163–65 (2003) (collecting and classifying state laws).

were Judge Gray considered a solo candidate for Vice President and were he to win a majority of the popular vote, Michigan's electors would find themselves in an impossible situation. Under the Constitution they would be bound to cast votes for President and Vice President, but under Michigan law their hands would be tied. The law would bind them to vote for the Libertarian Party's presidential candidate and no one else—but the Party has no presidential candidate. The electors thus could cast no electoral vote for President without disqualifying themselves from the position under Mich. Comp. Laws § 168.47.[2] This conundrum makes clear that Michigan's election laws, both individually and as a whole, clearly contemplate the nomination and election of full tickets only.

Of course, Plaintiffs do more than argue that state law requires Judge Gray to be placed on the ballot. They argue that the Constitution requires it as well and thus, to the extent that state law prohibits solo candidates, that law is void. But this argument is also suspect.

The Constitution places few restrictions on states' power to determine their electors. It sets their number and allows Congress to determine when they are chosen and when they vote. U.S. Const. art. II, § 1, cl. 2 (electors shall be "equal to the whole number of Senators and Representatives to which the State may be entitled in the Congress"); *id.* cl. 4 ("The Congress may determine the time of choosing the electors, and the day on which they shall give their votes, which day shall be the same throughout the United States"). But it does not require that the state appoint

electors according to the popular vote or by any other means. Rather, it allows that states "shall appoint" electors "in such manner as the Legislature thereof may direct." *Id.* § 1, cl. 2.

The U.S. code confirms the power of states in matters regarding their electors. Title 3, Section 5 provides that the legislatures can set the rules governing appointment of electors, and that any such appointment "shall be conclusive." 3 U.S.C. § 5. Section 6 provides that a state's executive must certify the state's determination regarding any elector controversy, 3 U.S.C. § 6, and Section 15 confirms that the state's determination is not to be second-guessed. 3 U.S.C. § 15 ("[N]o electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to according to section 6 of this title from which but one return has been received shall be rejected."); *see also* 3 U.S.C. § 4 (providing that state legislators have power to fill any electoral vacancies).

The Supreme Court has expressly affirmed the states' control over how they choose electors. *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S.Ct. 3, 36 L.Ed. 869 (1892) ("[F]rom the formation of the government until now the practical construction of [art. II, § 1, cl. 2] has conceded plenary power to the state legislatures in the matter of the appointment of electors."); *see also Bush v. Gore*, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ("The State, of course, ... can take back the power to appoint electors."). Further, in 1952, the Supreme Court upheld a state requirement that candidates

**2.** Plaintiffs argue that to the extent "it is too difficult to count votes for Judge Gray as vice president without also counting them as votes for a presidential candidate, then such votes should also be counted as votes for Gary E. Johnson for president." This unsupported as-

sertion fails even to acknowledge Michigan law expressly prohibiting such a practice, and it rather lays bare this whole exercise as an attempted end-run around the federal courts' rulings refusing to include Gary Johnson or Gary E. Johnson on the ballot.

for Democratic party elector must pledge to vote for the national party's presidential and vice-presidential nominees. *Ray v. Blair*, 343 U.S. 214, 227–31, 72 S.Ct. 654, 96 L.Ed. 894 (1952). The Court noted the "long-continued practical interpretation of the constitutional propriety of an implied or oral pledge of his ballot by a candidate for elector" and concluded that such a pledge was simply "an exercise of the state's right to appoint electors in such manner . . . as it may choose." *Id.* at 227–28, 72 S.Ct. 654. Though the Court was not in a position to decide whether the pledge was ultimately enforceable, the opinion's reasoning strongly suggested that it would be. *Id.* at 230 ("Surely one may voluntarily assume obligations to vote for a certain candidate.").

The relevant constitutional history further supports this conclusion. Under the 1787 Constitution, electors were given two undifferentiated votes for President. There was no separate vote for Vice President; instead, the position was given to the second-place finisher for President. *See* U.S. Const. art. II, § 1, cl. 2–3 (amended 1804). This system was not built with political parties in mind. But as early as 1796, the Federalists and the Republicans were running separate candidates for President and Vice President. The rise of political parties highlighted a problem with this system. The Constitution provided no way for electors to signal that they preferred a certain candidate for Vice President and not President. A vote was a vote for President, regardless of the elector's intent. Party officials soon created a workaround for this problem. All of the party's electors would cast votes for the party's favored presidential candidate, but a few electors would cast their second votes for a dummy candidate, ensuring that the favored presidential candidate would lead slightly. *See generally* Akhil Reed Amar & Vik Amar, *President Quayle?*, 78 Va. L. Rev. 913, 918–24 (1992); Akhil Reed Amar, *America's Constitution* 336–44 (2005).

This workaround was not particularly effective. In 1796, the Federalist candidate for President, John Adams, won the presidency. But too many of the Federalist party's electors sloughed off, allowing the Democratic–Republican Thomas Jefferson to gain office over the Federalists' favored vice-presidential candidate, Thomas Pinckney. The problems continued in 1800. In that election, the Democratic–Republican ticket of Jefferson and Aaron Burr beat both Federalist candidates. But this time, too few electors sloughed off, leaving the presidential and vice-presidential candidates in a tie. Under the Constitution, the matter was then sent to the House of Representatives, where the Federalist-controlled House threatened to place Burr in the presidency, rather than Jefferson. Only after 35 tie votes did the House finally produce a majority in favor of the preferred Jefferson—Burr ticket.

In light of this debacle, the Twelfth Amendment was proposed in 1803 and ratified in 1804. This amendment did not forbid or discourage party-line voting. Instead, it scrapped the double-ballot system in favor of separate electoral votes for President and Vice President. U.S. Const. amend. XII. This allowed parties to elect their preferred tickets without informal workarounds and clandestine machinations, legitimizing the emerging party system and implicitly (though perhaps grudgingly) approving of party tickets and party-line voting.

This is not to say that the Twelfth Amendment *requires* party-ticket voting for President and Vice President. The text of the amendment suggests no such thing, and as discussed above, the states have great latitude in choosing electors

and guiding their behavior. But nor does the Twelfth Amendment mandate split-ticket voting. Instead, it left that decision where it had been—with the states. *See* U.S. Const. art. II, § 1, cl. 2 ("Each state shall appoint, in such manner as the Legislature thereof may direct, a number of electors . . . .").

There are many reasons a person may prefer straight-ticket voting for President and Vice President. Because the Vice President takes over the President's duties when the President is incapacitated or dead, the people may prefer that both executives be of the same party, to avoid switches in party control midway through a term. A split executive, with President and Vice President of different parties, may also be contentious and cause a breakdown in governmental functioning. In such cases, the President may be less willing to cede powers or duties to his Vice President, and he may be less willing to keep confidences with a member—indeed, likely the *de facto* head—of the opposition. *See generally* Joel K. Goldstein, *The New Constitutional Vice Presidency,* 30 Wake Forest L. Rev. 505, 550–54 (1995). Indeed, a number of states, including Michigan, have long tied their own executive offices, requiring that voters cast a single vote for the Governor—Lieutenant–Governor ticket. *See* Mich. Const. art. V, § 21 ("In the general election one vote shall be cast jointly for the candidates for governor and lieutenant governor nominated by the same party."); Akhil Reed Amar & Vik Amar, *President Quayle?,* 78 Va. L. Rev. 913, 915 n. 5 (1992).

Plaintiffs may object that this decision should be left to the individual voters: if a majority of the electorate wants a split executive, then they will vote in a split executive. But simply allowing separate votes for President and Vice President can lead to unexpected results. For instance, in a close race (say, where two parties each have 49% of the population voting straight-ticket) a small minority of split-ticket voters (the remaining 2%) can throw a majority to their favored candidates, even if the remaining 98% of the population preferred a unitary executive—even if it was not their party—to a split executive. *See id.* at 934–35. Though ballots can be structured to tease out the electorate's preferences, *see id.* at 935–37, these ballots could become quite complicated as the number of potential candidates grows. These potential complications are more than sufficient to justify a legislative solution. *See Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 364, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) ("States certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials.").

Far from having no interest in keeping Judge Gray off the ballot, the Secretary has compelling reasons to do so. The people of Michigan, through their elected representatives, have provided for unified presidential—vice-presidential ballots. If the people wish to change that system, they can do so through the usual legislative channels. But for this court to force the Secretary to allow a vice-presidential candidate to run on his or her own, as Plaintiffs request, would subvert that system and countermand the will of the people of Michigan. Plaintiffs have not shown that the Constitution requires such a result.

Further, to the extent that Plaintiffs argue that straight-ticket votes for the Libertarian Party should be counted as votes for Judge Gray even if he is not listed on the ballot, the Secretary's interests in avoiding voter confusion and in protecting the integrity and efficiency of the ballot are more than sufficient to sup-

750

port her decision. The ballot contains no indication that a straight-ticket vote for the Libertarian Party would be treated as a vote for Judge Gray, and voters would not be expected to assume as much. For her part, the Secretary cannot simply assume that each straight-ticket Libertarian Party voter would also have voted for Judge Gray if given the chance, and to so assume could distort individuals' votes. For the Secretary to abide by the state's standard ballot-access rules in this situation is not constitutional error.

## IV. CONCLUSION

Though Plaintiffs frame their argument here narrowly, the principle they seek to establish is broad and far-reaching. Plaintiffs would force the states to admit solo candidates for President and Vice President, and thus to effectively allow split-ticket voting, working a sea change in the law and impinging on the states' "plenary power" to appoint electors in the manner they see fit. *McPherson v. Blacker,* 146 U.S. 1, 35, 13 S.Ct. 3, 36 L.Ed. 869 (1892). Plaintiffs cite no precedent whatsoever in support of this bold claim, arguing only that the Party's interest in maintaining collateral benefits and Mr. Gelineau's interest in voting for Judge Gray for Vice President outweigh the Secretary's interest in enforcing the State's election laws as written. But this is not the case. Indeed, it is not even close. The people of Michigan, through their legislature, have decided to prohibit candidates for Vice President who are not tied to a presidential candidate. The Constitution does not forbid this decision, and Plaintiffs present no interest that would outweigh the State's interest in enforcing it. This claim therefore fails.

As this court has previously noted, "a finding that there is simply no likelihood of success on the merits is usually fatal."

*Gonzales v. Nat'l Bd. of Med. Examiners,* 225 F.3d 620, 625 (6th Cir.2000). Whether Plaintiffs claims fail on laches or on the merits, it is clear that they fail. The court will therefore deny Plaintiffs' second motion for temporary injunctive relief.

### *ORDER*

For the reasons discussed above, Plaintiffs' motion for temporary restraining order and preliminary injunction (ECF No. 21) is hereby **DENIED.**

**IT IS SO ORDERED.**